## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **JOHN NIGRO**<br>**256 Labrador Lane**<br>**Townsend, DE 19734**<br><br>    **Individually and on behalf of**<br>    **all others Similarly Situated,**<br><br>        **Plaintiff**<br>  **vs.**<br><br>**COVENTRY HEALTH CARE, INC.**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**DALE B. WOLF**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**ALLEN F. WISE**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**SHAWN M. GUERTIN**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**PATRISHA DAVIS**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**COVENTRY 401(k) PLAN**<br>   **INVESTMENT COMMITTEE**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**And**<br><br>**JOHN DOES 1-10**<br>7605 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>          **Defendants** | **Civil Action No.** _____<br><br><br>**CLASS ACTION COMPLAINT**<br>**FOR VIOLATIONS OF ERISA** |

## CLASS ACTION COMPLAINT

### I.    Introduction

1.      Plaintiff John Nigro ("Plaintiff") alleges the following based upon personal information and the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Defendant Coventry Health Care, Inc. ("Coventry" or the "Company"), including the Company's annual and quarterly reports and the Annual Reports (Form 11-K) filed on behalf of the Coventry Health Care, Inc. Retirement Savings Plan (the "Plan"), a review of press releases and other public statements by the Company, third party media and analyst reports, and available documents governing the operations of the Plan.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      Plaintiff brings this action on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.  The Plan is a retirement plan sponsored, established and operated by Coventry.

3.      To encourage savings for retirement, ERISA-governed 401(k) plans confer tax benefits on participating employees.  A company may offer plan participants its own shares (company stock) as a plan investment option and plan participants may choose company stock as a part of their retirement investment portfolio.

4.      Defendants offered Coventry common stock ("Company Stock") as a Plan investment option throughout the proposed class period, February 2007 until the present (the "Class Period").

5.    Plaintiff was a participant in the Plan at all relevant times and held Company

Stock in his Plan account during the proposed Class Period.

6.    Plaintiff alleges that the Defendants, who are fiduciaries of the Plan, failed to act

solely in the best interests of the Plan's participants and beneficiaries and failed to exercise the

required skill, care, prudence, and diligence in administering the Plan and the Plan's assets at all

relevant times.

7.    Plaintiff alleges that Defendants permitted a large percentage of the Plan's assets

to be invested in Company Stock throughout the Class Period despite the fact that they clearly

knew or should have known that such investment of Plan participants' retirement savings was

unduly risky and imprudent due to the Company's issuance of materially false financial

information and dissemination of false statements about Coventry's business that artificially

inflated the stock's share price.   As a result, Company Stock was an unduly risky and

inappropriate investment option for Plan participants' retirement savings at all relevant times.

8.    Despite its risky nature, the Plan acquired significant Company Stock holdings

and allowed Company Stock to become one of its largest investments.  In October 2008,

Company Stock lost nearly half its market value and slashed its full year forecast.  The Plan and

its participants who were heavily invested in the stock lost tens of millions of dollars.

9.    Plaintiff alleges in Count I that Defendants who were responsible for the

investment of the Plan's assets breached their fiduciary duties to the Plan's participants in

violation of ERISA by failing to prudently and loyally manage the Plan's investment in Company

Stock.  In Count II, Plaintiff alleges that Defendants who were responsible for the selection,

monitoring and removal of the Plan's other fiduciaries failed to properly monitor the performance

of their fiduciary appointees and remove and replace those whose performance was inadequate,

and failed to provide them with the necessary information to fulfill their fiduciary duties. In Count III, Plaintiff alleges that Defendants breached their duty to avoid improper conflicts of interest. Count IV alleges that Defendants breached their duty to provide accurate information to the Plan. Finally, in Count V, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management; complete and accurate communications; and adequate monitoring.

10. As explained below, at all relevant times, Defendants imprudently permitted the Plan to acquire and hold Company Stock despite the Company's serious mismanagement, inflated business prospects, and financial circumstances. According to publicly available information, Defendants' breaches have caused the Plan to lose tens of millions of dollars of retirement savings.

11. This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

12. ERISA §§ 409(a) and 502(a)(2) authorize participants, such as the Plaintiff, to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Company Stock at all relevant times.

#1185415v.1

13.     Because some of the information and documents which will support Plaintiff's claims are solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support Plaintiffs' claims.

## II.     Jurisdiction and Venue

14.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

15.     **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Maryland.

16.     **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district and Coventry has its principal place of business in this district.

#1185415v.1

## III.    Parties

### A.    Plaintiff

17.    Plaintiff John Nigro is a resident of the Delaware.  Plaintiff is a former Coventry

employee and is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. §

1002(7), and held Coventry shares in his individual Plan account at all relevant times.

### B.    Defendants

18.    **Defendant Coventry Health Care, Inc.** is a Delaware corporation, with its

principal executive offices located at 6705 Rockledge Drive, Suite 900, Bethesda, Maryland

20817.  Coventry is a national managed health care company that operates health plans,

insurance companies, network rental/managed service companies, and workers' compensation

services companies.  Coventry offers managed care services to individuals, employer and

government-funded groups, government agencies, and other insurance carriers and

administrators through sales staff in its Commercial Business, Individual Consumer &

Government Business, and Specialty Business divisions.

19.    At all relevant times, Company Stock traded on the New York Stock Exchange

under the symbol "CVH."

20.    Upon information and belief, Coventry, at all times, acted through its officers,

directors and employees, including, but not limited to, members of the Company's 401(k) Plan

Investment Committee (the "Investment Committee"), who were appointed to perform Plan-

related fiduciary functions, and did so in the course and scope of their services for the Company.

21.    At all relevant times, Coventry was a Plan fiduciary in that it had, upon

information and belief, at all applicable times, effective control over the activities of its officers,

directors and employees, including their Plan-related activities.  Through its Board of Directors

6

(the "Board"), or otherwise, Coventry had the authority and discretion to hire and terminate said officers and employees. Coventry also had the authority and discretion to appoint, monitor and remove officers, directors and employees that performed fiduciary functions with respect to the Plan, including members of the Investment Committee. The actions of the Company's officers, directors, and other employee fiduciaries are imputed to Coventry under the doctrine of *respondeat superior*, and Coventry is liable for these actions.

22.    **Defendant Dale B. Wolf** ("Wolf") served as President and Chief Executive Officer ("CEO") of the Company from January 2005 until January 2009 and as a Director of the Company until May 2009. At all relevant times, Defendant Wolf had certain fiduciary responsibilities with respect to the Plan, including appointing, monitoring, and removing members of the Investment Committee. Defendant Wolf also possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

23.    At the start of the Class Period, when the Company's Stock price was at or near its peak, Defendant Wolf sold approximately $7 million in Company Stock (in February 2007) and another $6 million in March 2007.

24.    **Defendant Allen F. Wise** ("Wise") serves as the current CEO of Coventry and, at all relevant times, as the Chairman of the Board of Directors of the Company. Defendant Wise was the company's President and CEO from 1996 through 2004, when he was replaced by Defendant Wolf. Defendant Wise served as Coventry's non-executive Chairman from 2004 until December 10, 2008, when he was named Executive Chairman. At all relevant times, Defendant Wise had certain fiduciary responsibilities with respect to the Plan, including appointing, monitoring, and removing members of the Investment Committee. Defendant Wise also

7

possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

25.     At the start of the Class Period, when the Company's Stock price was at or near its peak, Defendant Wise sold approximately $14.5 million in Company Stock in February 2007 and another $16 million in June 2007.

26.     **Defendant Shawn M. Guertin** ("Guertin"), served at all relevant times, as the Plan Administrator.  Defendant Guertin also serves as Coventry's Executive Vice President, Chief Financial Officer, ("CFO") and Treasurer.  Defendant Guertin has announced his resignation from the Company effective at the end of 2009.  At all relevant times, Defendant Guertin signed relevant Plan filings with the SEC.  *See* Coventry Form 11-K, dated June 29, 2009 ("2009 11-K")(attached as Ex. A).  Defendant Guertin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and, with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

27.     At the start of the Class Period, when the Company's Stock price was at or near its peak, Defendant Guertin sold approximately $18 million in Company Stock in February 2007 for his personal account.

28.     **Defendant Patrisha Davis** ("Davis"), served at all relevant times, as the Plan Administrator.   Defendant Davis also serves as the Senior Vice President and Chief Human Resources Officer of the Company.  Defendant Davis signed relevant Plan filings with the SEC. *See* Ex. A.  Defendant Davis was a fiduciary of the Plan within the meaning of ERISA in that

8

she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

29.     **Defendant 401(k) Plan Investment Committee** (the "Investment Committee"). At all relevant times, the Investment Committee served as the Plan's investment fiduciary and administered the Plan and the Plan's assets and acted as a fiduciary with respect to the Plan. *See* Ex. A at 5. Upon information and belief, the Investment Committee was comprised of employees, officers, or directors of Coventry, who were charged with designating investment funds for the Plan, establishing rules and procedures with respect to the Plan's investment funds and monitoring the performance of the Plan's investments. At all relevant times, the members of the Investment Committee were appointed by the Coventry Board. The Investment Committee and its members were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

30.     The identities of the individual Investment Committee Defendants are currently unknown to Plaintiff and are therefore named fictitiously as **John and Jane Does 1-10.** Once the identities of the Investment Committee Defendants are ascertained, Plaintiff will seek leave to join them under their true names.

## IV.     The Plan

31.     The Plan, sponsored by Coventry, is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(1) and defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

9

32.    The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

33.    The assets of an employee benefit plan, such as the Plan, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  At all relevant times, the assets of the Plan were held in trust by T. Rowe Price Trust Company pursuant to a trust agreement.  All contributions made to the Plan constitute a form of deferred compensation.

34.    Defendant Coventry established the Plan on April 1, 1998 for the benefit of eligible employees. *See Coventry Health Care, Inc. Retirement Savings Plan Summary Plan Description, dated January 1, 2008,* at 4 (Ex. B). The Plan was amended and restated on various occasions, including for the Economic Growth and Tax Relief Act of 2001 and on January 1, 2006.

35.    The Plan is a defined contribution plan established by the Company under the provisions of Section 401(a) of the Internal Revenue Code, which includes a qualified cash or deferred arrangement as described in Section 401(k) of the Code, for the benefit of eligible employees of the Company.  All employees of the Company are automatically eligible to participate in the Plan upon commencement of employment, unless an alternate qualified plan is available to certain employees during the 410(b) transition period for newly acquired entities which may previously have sponsored a qualified plan prior to acquisition. *Id.* at 5.

#1185415v.1

36.     Eligible employees are automatically enrolled in the Plan with a deferral rate of 6% of their compensation unless they specify otherwise. *Id.* at 4. Eligible employees can contribute an amount of up to 75% of their compensation subject to certain legal limitations. *Id.*

37.     Throughout the Class Period, the Plan offered various investment options for participant contributions, including Company Stock through the Company Stock Fund. Ex. A at 8.

38.     The Company provides a matching contribution equal to 100% of each participant's contribution up to a maximum of 3% of compensation and 50% of each participant's contribution in excess of 3% up to a maximum of 6% of eligible pay. (Ex. B at 7). Company matching contributions are made in shares of Company Stock. *Id.* Once credited, participants recently were granted the option to transfer the funds to other available investment options in the Plan. *Id.*

39.     At all relevant times, Company Stock was one of the Plan's principal investment options. Company Stock represented a significant portion (approximately 25% in 2007) of the Plan's total assets. *See* Ex. B at 8, 12. As a result of the losses the Plan sustained through various fiduciary breaches, at the end of 2008, Company Stock consisted of approximately12% of Plan assets.

40.     According to the 2008 11-K at 8, the Plan held 565,647 shares of Company Stock, then having a market value of approximately $49,895,466 on January 1, 2009. *Id.* The Stock Fund previously held $130,960,024 in Company Stock on December 31, 2007. *Id.* The Plan incurred substantial losses resulting from their investment in Company Stock.

11

41.    On information and belief, nothing in the Plan limits the ability of the Plan's fiduciaries to remove the Company Stock Fund as an investment option. Since the beginning of the Class Period, the value of Company Stock has suffered significant declines.

42.    The Plan incurred substantial losses as a result of its investment in Company Stock due to the revelation of Defendants' material misrepresentations and omissions concerning its business operations and financial performance and outlooks and Defendants' breaches of their fiduciary duties under ERISA which are described more fully below.

## V.    Defendant's Fiduciary Status

43.    *Named Fiduciaries.* ERISA requires every plan to provide for one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

44.    *De Facto Fiduciaries.* ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent he or she "(i) exercised any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

45.     Each of the Defendants was a fiduciary with respect to the Plan and each was required under ERISA § 404(a)(1), 29 U.S.C. § 1104(a0(1) to manage and administer the Plan and its investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

46.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

47.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of the participants and beneficiaries, not in the interest of the sponsor.  Moreover, all Plan fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of Coventry with respect to the Plan, the Plan's investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plan's participants.

48.     ***Defendant Coventry's Fiduciary Status.***  At all relevant times, under the terms of the Plan, Coventry, through its Board of Directors as well as its officers and employees, including members of the Investment Committee, had direct control and management over all aspects of the operation, or administration of the Plan that were not specifically delegated to the named fiduciaries under the Plan.  Upon information and belief, Coventry exercised this control.

13

49.    Upon information and belief, Coventry has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan and, on information and belief, retains the power to hire, appoint, monitor, terminate and replace such employees at will. As a matter of corporate law, Coventry is imputed with the knowledge that its officers and employees had knowledge of the misconduct alleged herein, even if not communicated to Coventry. Coventry is thus responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

50.    Additionally, under basic tenets of corporate law, Coventry is imputed with the knowledge that the other Defendants possessed regarding the misconduct alleged herein.

51.    Upon information and belief, Coventry exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's Summary Plan Descriptions and by providing participants with information and materials required by ERISA. In this regard, Coventry drafted and disseminated various documents and materials related to the Plan, including but not limited to, an SPD.

52.    Consequently, in light of the foregoing duties, responsibilities, and actions, Coventry is a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control with respect to the management or disposition of the Plan's assets, and/or had exercised discretionary authority or control with respect to the administration of the Plan or the appointment and oversight of other Plan fiduciaries.

53.    ***Defendant Wolf's Fiduciary Status.*** As the Company's Chief Executive Officer and a Director at all relevant times, Defendant Wolf had the authority to manage the business

14

and affairs of the Company. Because Coventry was, as alleged above, a fiduciary of the Plan at all relevant times, with the authority to select, monitor, retain, and remove Plan fiduciaries, including members of the Investment Committee and, accordingly, exercised authority and oversight over the such fiduciaries, Defendant Wolf was necessarily a Plan fiduciary as he had ultimate authority for the affairs of the Company.

54.    Upon information and belief, Defendant Wolf was charged with appointment of Investment Committee members, who, on information and belief, are fiduciaries of the Plan, Defendant Wolf had the duty to monitor, and to remove the Investment Committee members. Thus, according to DOL regulations, Defendant Wolf exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8.

55.    Consequently, in light of the foregoing duties, responsibilities and actions, Defendant Wolf was a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), at all relevant times in that he exercised authority or control respecting management or disposition of the Plan's' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

56.    ***Defendant Wise's Fiduciary Status.*** As the Company's Executive Chairman, Chairman of the Board of Directors and current Chief Executive Officer, Defendant Wise had authority to manage the business and affairs of the Company. Because Coventry was, as alleged above, a fiduciary of the Plan at all relevant times, with the authority to select, monitor, retain, and remove Plan fiduciaries, including members of the Investment Committee and, accordingly, exercised authority and oversight over the such fiduciaries, Defendant Wolf was necessarily a Plan fiduciary as he had ultimate authority for the affairs of the Company.

15

57.    Upon information and belief, Defendant Wise was charged with appointment of Investment Committee members, who, on information and belief, are fiduciaries of the Plan, Defendant Wise had the duty to monitor, and to remove the Investment Committee members. Thus, according to DOL regulations, Defendant Wise exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8.

58.    Consequently, in light of the foregoing duties, responsibilities, and actions, Defendant Wise was a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), at all relevant times, as he exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

59.    ***Defendant  Guertin's Fiduciary Status.***  Defendant Guertin served as the Plan Administrator for the Plan at all relevant times.  On information and belief, as Plan Administrator, Defendant Guertin had responsibility for communicating with participants regarding the Plan in a plan-wide uniform, mandatory manner, by providing participants with information and materials required by ERISA.  *See, e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan, a summary plan description).  In this regard, on behalf of the Company, Defendant Guertin disseminated the Plan's documents, such as the SPD and related materials.

60.    Consequently, in light of the foregoing duties, responsibilities and actions, Defendant Guertin was a both named and *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) at all relevant times in that he exercised discretionary

16

authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

61.    ***Defendant Davis' Fiduciary Status.***  Defendant Davis served as the Plan Administrator for the Plan at all relevant times.  On information and belief, as Plan Administrator, Defendant Davis had responsibility for communicating with participants regarding the Plan in a plan-wide uniform, mandatory manner, by providing participants with information and materials required by ERISA.  *See, e.g.,* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan, a summary plan description).  In this regard, on behalf of the Company, Defendant Davis disseminated the Plan's documents, such as the SPD and related materials.

62.    Consequently, in light of the foregoing duties, responsibilities and actions, Defendant Davis was a both named and *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) at all relevant times in that she exercised discretionary authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

63.    ***The Investment Committee Defendants' Fiduciary Status.***  Upon information and belief, the Investment Committee is a "named fiduciary" of the Plan for investment purposes as that term is defined under ERISA; it is responsible for directing and coordinating all activity relating to the investment management of the assets of the Plan.  In discharging the foregoing duties, the Investment Committee, upon information and belief, has the authority and discretion to add investment options or eliminate investment options.

17

64.     Additionally, upon information and belief, in their capacity to select and monitor investment options for the Plan, the Investment Committee had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in Company Stock.

65.     Accordingly, the Investment Committee was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or control with respect to the management of the Plan and/or management and disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## VI.     <u>Facts Bearing on Breach of Fiduciary Status</u>

**A.     Coventry Was an Imprudent Retirement Investment for the Plan at all relevant times Because of the Company's Serious and Material Misrepresentations, Omissions and Mismanagement**

66.     A fiduciary's duty of prudence requires fiduciaries to act prudently, loyally, and with the exclusive purpose of providing benefits to plan participants and beneficiaries. Accordingly, a fiduciary may not ignore circumstances, such as those here, that increase the risk of loss to participants and beneficiaries to an imprudent and unacceptable level.

67.     Coventry's inaccurate and misleading statements and omissions significantly increased the risk of loss to Plan participants by contributing to the artificial inflation of the value of Company Stock. As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated. Brief of Secretary of Labor as Amicus Curiae Supporting Appellants and Requesting Reversal at 15016, *In re Calpine Corp. ERISA Litig.,* No. 06-15013 (9th Cir. Nov. 15, 2006).

18

68.    At all relevant times, Company Stock became an imprudent option for retirement savings because the Company and certain of the Defendants:

(i)    underpriced a new product to create the appearance that it was capable of creating high growth to offset other contracting Coventry business units;

(ii)    failed to disclose the true risks of its under-pricing strategy;

(iii)    hid the material effects of its under-pricing strategies;

(iv)    issued materially inaccurate disclosure and internal control representations; and

(v)    lacked a reasonable basis for positive statements about the Company's prospects and earnings guidance.

All of these practices contributed to the artificial inflation of the Company Stock price, creating dire financial circumstances that rendered the Company Stock an imprudent retirement savings option for the Plan's assets.

69.    When these practices came fully to light in August 2008, the value of Company Stock had plummeted from approximately $40 per share to less than $14 per share over the course of the Class Period. During this time, Company Stock has lost approximately 60% of its value.

70.    The Plan's substantial holdings in Company Stock greatly increased the Plan's risk of loss. Given that the Plan's purpose is to allow employees to save for retirement, the Plan's fiduciaries' failure to take any meaningful steps to protect the Plan from the losses caused by holding hundreds of millions of dollars of Company Stock and acquiring even more was a fiduciary breach. The Plan's fiduciaries continued and continue to make matching contributions to the Plan in Company Stock, offer Company Stock as a Plan investment option, and purchased additional shares even while the stock was plunging in value.

#1185415v.1

71.    A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan suffered such huge losses.  As a result of Defendants' failure to protect the Plan in light of these practices, the Plan lost tens of millions of dollars in Plan participants' retirement savings.

### 1.    **Background**

72.    Defendant Coventry operates is a managed healthcare company that operates through health plans, insurance companies and workers compensation service companies.  It is comprised of three main divisions: Commercial Business; Individual Consumer & Government Business; and Specialty Business.

73.    In late 2006, Coventry announced that it had recently launched a Medicare Private-Fee-For-Service ("PFFS")[1] initiative, entitled "Advantra Freedom" which it announced was to become a growth engine for the Company.  This product was marketed by Coventry's Individual Consumer & Government division.

74.    Upon information and belief, Defendants deliberately under-priced its PFFS product in order to obtain new members and in order to convince Coventry's shareholders, including Plaintiff and other participants in the Plan, that the PFFS initiative was capable of achieving high growth and profitability.  Thus, although Coventry's PFFS products rapidly gained market share, those gains were illusory and eventually had a materially negative impact on the Company's profit margins and profitability.

75.    Coventry's under-pricing strategies and other deceptive practices did not accurately reflect the Company's true "medical loss ratio" ("MLR"), the ratio of expenses of providing healthcare services. A low MLR indicates that a lower percentage of a company's

---

[1] A PFFS is a type of Medicare plan offered by a private company that contracts with Medicare to provide individuals with Medicare benefits.  An individual with a PFFS may go to any Medicare-appointed doctor or hospital that accepts the plan's payment.  The insurance plan, rather than the Medicare program decided how much it will pay and how much an individual pays.  *See Your Guide to Medicare Private Fee-for-Service Plans,* *www.medicare.gov./Publications/Pubs/pdf/10144.pdf.*

#1185415v.1

revenue is being spent paying health care claims, and thus greater profits are generated. The MLR is a closely watched indicator of the financial health of healthcare companies like Coventry. Generally, a company with low MLRs is rewarded on Wall Street with higher stock prices.

> **2.    Coventry Disseminated Materially Incomplete and Inaccurate Information Regarding Its Financial Condition**

76.    Throughout 2007, Defendants issued numerous materially false and misleading statements and omissions which failed to disclose that the Company was deliberately under-pricing its new PFFS product to obtain members in order to create the appearance that its PFFS was capable of achieving high growth rates. At the same time, Coventry was issuing positive, false and misleading statements about its businesses and finances.

77.    On February 9, 2007, Coventry issued a press release announcing financial results for its fourth quarter and year ended December 31, 2007. The Company also announced that it was increasing its 2007 Medicare PFFS membership growth expectations by 65% to 90,000-100,000 members. That same day, on a conference call for investors with securities analysts, Defendant Wolf reiterated that Coventry expected "somewhere between 90,000 and 100,000 members by year-end." Defendant Guertin added that the Company's "newest growth initiative, Medicare Private-Fee-For-Service, is off to a roaring start" and "exceeding our expectations. . . but in terms of the total membership and how quickly it is coming on board." Additionally, Defendant Guertin raised it guidance on PFFS from 50,000-65,000 members with expected revenue of $500,000 to 90,000 to 100,000 members by year end with revenues of $700 million.

78.    When asked specifically about the risk that Coventry had achieved higher than expected growth rates by under-pricing the market, Defendant Wolf stated that he had "a high degree of confidence in our financial and actuarial teams who built this."

21

79.    On March 15, 2007, Coventry issued a press release announcing that it had been selected by the West Virginia Public Employees Insurance Agency to provide retiree health benefits for its 35,000 members.  Later that week, Defendant Guertin publically remarked that the Company would "exceed our own expectations and probably just about anyone's expectations" on private fee-for-service with 135,000 new members and new revenue in excess of $900 million for the year.

80.    On April 27, 2007, Coventry issued a press release announcing its financial results for its first quarter of 2007, the period ended March 31, 2007.  The Company reported operating revenues of $2.24 billion and net earnings of $121.7 million.  The Company's financial results for the first quarter of 2007 were repeated in the Company's Form 10-Q filed with the SEC on or about May 10, 2007, which was signed by Defendants Wolf and Guertin.  The Form 10-Q represented that: "Managed care premium revenue increased as a result of growth in our Individual Consumer and Government Business division.  This growth is primarily a result of new membership from our new Medicare Private-Fee-For-Service products and additional members in both our Medicare Part D and Medicare Advantage products."

81.    The first quarter 2007 10-Q predicted that the Company's three business lines would perform as follows:

> Commercial Division - we believe Commercial group risk membership will return to being flat with the December 2006 year-end results, to potentially down one percent and expect the health plan ASO membership to be up between 2% -3%. We will continue to expand our commercial footprint in our new markets of Oklahoma City and South Carolina, as well as opening up in a new market in Memphis.
>
> Individual Consumer & Government Division - our new product for 2007, Private-Fee-For-Service, is off to a very robust start and is being offered in 43 states.  By year-end, we are expecting 135,000 new members and almost $1 billion of new revenue.

22

> Specialty Division - our acquisition of Concerta's workers compensation business, effective April 2, 2007 is expected to have a small favorable effect on earnings this year.

82.    Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the first quarter 2007 10-Q.

83.    Defendant Coventry hired Plaintiff in May 2007.  Plaintiff began participating in the Plan at this time.  Plaintiff also began investing his retirement savings in Company Stock as made available by the Plan at this time.

84.    On July 31, 2007, Coventry issued a press release announcing its financial results for its second quarter of 2007, the period ended June 30, 2007.  For the quarter, the Company reported operating revenues of $2.33 billion and net earnings of $151.3 million or $0.96 per diluted share.  Defendant Wolf commented that he was "pleased to report another strong quarter from our well-diversified portfolio of businesses."  He noted the "outstanding medical loss ratio" the Commercial Business division had achieved, as well as the Individual Consumer & Government Business divisions "impressive growth."

85.    On August 8, 2007, Coventry filed its second quarter 2007 financial results in a Form 10-Q filed with the SEC and signed by Defendants Wolf and Guertin.  As before, the second quarter Form 10-Q trumpeted a "managed care premium revenue increase[d] as a result of growth in our Individual Consumer and Government Business division."

86.    The second quarter 2007 10-Q represented that it expected its three business lines would perform as follows:

> Commercial Division - we expect that  on an organic basis the health plan ASO membership will be slightly down at year-end as compared to our June 30, 2007 membership and expect Commercial group risk membership in the aggregate will be slightly up at year-end as compared to our June 30, 2007 membership.

#1185415v.1

Individual Consumer & Government Division - for our new product for 2007, Private-Fee-For-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end.

Specialty Division - our acquisition of Concentra's workers compensation business April 2, 2007 is expected to have a small favorable effect on earnings this year.

87.    Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the second quarter 2007 Form 10-Q.

88.    On October 26, 2007, Coventry issued a press release announcing its financial results for its third quarter of 2007, the period ending September 30, 2007. The Company reported operating revenues of $2.52 billion and net earnings of $168.7 million, or $1.08 per diluted share. Defendant Wolf commented, "I am please to present another quarter of impressive top and bottom line growth from our well-diversified portfolio of businesses." Defendant Wolf predicted that Coventry would be able to "grow operating revenue by more than 25% in 2007 and approaching 30% in 2008."

89.    Coventry's financial results for the third quarter 2007 were repeated in the Company's Form 10-Q filed with the SEC on or about November 9, 2007, which was signed by Defendants Wolf and Guertin. The Form 10-Q reported that "managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions. The growth resulted primarily from sales of new products. . . . In 2007, we began selling our new PFFS products and have increased sales of our individual product."

90.    Specifically, with regard to the PFFS program, the third quarter 10-Q reported that "Government revenue increased for the quarter and nine months ended September 30, 2007 from the same periods in 2006 as a result of membership from our new Medicare PFFS business. . . .".

24

91.     On January 7, 2008, the Company re-affirmed its earning expectations of $1.17 to $1.18 per diluted share for fourth quarter 2007 and $4.42 to $4.58 per diluted share for full year of 2008.

92.     On February 8, 2008, Coventry issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2007.  Coventry reported operating revenues of $2.79 billion and net earnings of $184.3 million or $1.18 per diluted share during the fourth quarter 2007 and total revenues of $9.88 billion and net earnings of $626.1 million, or $3.98 per diluted share for the year ended December 31, 2007.

93.     Coventry's financial results for its fourth quarter of 2007 and fiscal year were repeated in the Company's Form 10-K filed with the SEC on or about February 28, 2008, which was signed by Defendants Wolf and Guertin.

94.     The 2007 Form 10-K represented that: "Managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions.  The growth is a result of our new Medicare PFFS product . . ."

95.     Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the first quarter 2007 10-Q.

96.     On March 17, 2008, Coventry issued a press release that reported the Company's expectation that its GAAP earnings for 2008 would grow 10% to 13% in 2007 as compared to 2007 and adjusted its guidance for 2008 to:

> -- Consolidated revenues of $11.99 billion to $12.49 billion
>
> -- Consolidated MLR% of 79.9 to 80.3%
>
> -- Cost of sales expense of $160.0 million to $180.0 million
>
> -- GAAP EPS on a diluted basis of $4.39 to $4.50.

97.    On April 25, 2008, Coventry issued a press release announcing its financial results for its first quarter of 2008, the period ended March 31, 2008. Coventry reported operating revenues of $2.94 billion and net earnings of $125 million, or $0.81 per diluted share. Coventry also reiterated its 2008 earnings guidance. Defendant Wolf confirmed that "our businesses continue to perform well and are fundamentally sound. We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future."

98.    Coventry's financial results for the first quarter 2008 were repeated in the Company's Form 10-Q filed with the SEC on or about May 12, 2008, which was signed by Defendants Wolf and Guertin. The first quarter 2008 Form10-Q represented a continued growth in diluted earnings per share of 10% to 13% in 2008. Specifically, the Form 10-Q announced the Company's expectation that the Individual Consumer & Government Division expected to have "another year of strong growth."

99.    Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in Coventry's first quarter 2008 Form 10-Q.

### 3.    The Truth Begins to Emerge

100.    On June 18, 2008, Coventry issued a press release announcing that it had revised its 2008 outlook, reducing second quarter and full year 2008 earning per share estimates. The press release disclosed:

-- The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-Service (PFFS) business. The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submissions patterns of network-based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million. The Company is forecasting the overall Medicare

26

Advantage MLR to be between 87.2% and 87.6% for the first half of 2008 inclusive of the negative development outlined above and a revised view on 2008 PFFS performance. The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008. The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.

-- Commercial Group Risk MLR. The commercial group risk MLR is being pressured by higher than expected levels of outpatient utilization and, to a lesser extent, a higher than expected inpatient unit cost trend caused by an increased severity level of facility claims. The Company's revised 2008 health plan commercial group risk MLR forecast is approximately 80.3% versus previous guidance of approximately 78.8%. Based upon estimates through May 2008, the Company expects the second quarter MLR to be in the range of 82.3% to 82.7% with the first half of 2008 MLR in the range of 80.6% to 80.8%. The second half of 2008 is expected to run at an MLR of approximately 80.0%. The Company has initiated forward pricing action to reflect the higher than expected trend. The higher than previously expected commercial group risk MLR has resulted in a reduction of $0.32 per diluted share to the midpoint of the Company's 2008 EPS guidance.

-- Other Modifications. The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%. The reduction in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and an anticipation of Medicare Advantage membership growth of 100,000 members. The decrease in management services revenue guidance is driven by a lower than expected level of bill volume in the Company's worker compensation services business. Offsetting these decreases to the top-line are forecasted reductions in operating costs, including actions planned by the Company, and improvements in non-operating items. These modification to operating items have resulted in a reduction to the midpoint of the Company's 2008 EPS guidance of $0.09 per diluted share which is offset by the favorable $0.09 per diluted share impact of the non-operating changes to the Company's 2008 EPS guidance.

101.    Defendant Wolf stated that the Company was "very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year."

102.    The price of Company Stock declined by more than 22% from $40.00 to $31.30 per share on very heavy trading volume following the Company's earnings announcement.

103.    On July 25, 2008, Coventry issued a press release announcing its financial results for its second quarter of 2008, the period ending June 30, 2008. For the quarter, the Company

27

reported operating revenues of $2.98 billion and net earnings of $83.2 million or $0.55 per

diluted share.

104.    The Company's financial results for the second quarter 2008 were repeated in the

Company's Form 10-Q filed with the SEC on or about August 7, 2008, which was signed by

Defendants Wolf and Guertin. With regard to the PFFS business, the Form 10-Q reported:

> Medicare Advantage risk premium yields, excluding the effect of revenue ceded
> to external parties, per member per month increased as a result of the rate
> increases from the annual competitive bid filings for our Medicare Advantage
> products as well as from increases in risk factor adjustment scores for our
> Medicare Advantage products.  With the effect of the ceded revenue being
> included in the premium yield, the Medicare Advantage risk premium yields per
> member per month for the six month period ending June 30 decreased to $747.36
> in 2008 from $802.97 in 2007.  The decrease is a result of a larger portion of our
> Medicare PFFS business in 2008 being ceded to external parties through quota
> share arrangements. . . .
>
> . . . .
>
> The decrease in gross margin for the quarter ended June 30, 2008 was driven by
> increased medical costs associated with out Medicare PFFS business in 2008.
> This decrease is partially offset by higher gross margins for our Medicaid HMO
> and Individual businesses associated with the membership growth, both organic
> and acquired, as discussed above. . . .

105.    The second quarter 2008 Form 10-Q also disclosed that the Company had been

notified that its Pennsylvania Medicaid behavioral health contract, representing 107,000

members, had been terminated.

106.    Defendants Wolf and Guertin certified that the disclosure and internal control

representations were appropriate in Coventry's first quarter 2008 Form 10-Q.

107.    On  October 21, 2008, Coventry issued a press release announcing its financial

results for the third quarter of 2008, the period ended September 31, 2008.  For the quarter, the

Company reported operating revenues of $2.98 billion and net earnings of $85.5 million, of

$0.58 per diluted share.  Defendant Wolf called the 2008 results "unacceptable" and a "great

disappointment." Defendant Wolf indicated that the Company had implemented a "corrective action plan" and reported "confidence" in the Company's future strategic and financial prospects.

108. Defendant Guertin told securities analysts that the Company had "identified the areas pressuring operating results this year and have implemented action plans to improve our performance."

109. In response to these announcements, the price of Company Stock declined from $28.49 per share to $13.93 per share -- more than 51% -- on very heavy trading volume.

110. The Defendants' statements referenced in the preceding paragraphs were materially false and misleading when made because they misrepresented or failed to disclose certain adverse facts, which were known to Defendants or recklessly disregarded by them:

- that Coventry employed a strategy of under-pricing its PFFS program to create the appearance that the new program was capable of achieving the high growth needed to offset the Company's contracting Commercial business division;

- that the Company failed to disclose the true risks associated with its under-pricing strategies, including the fact that Coventry was generating new PFFS memberships at the expense of profitability;

- that the true negative effects of the Company's under-pricing strategies were masked by improper claims assumptions that materially understated Coventry's healthcare claim expenses;

- that Coventry's disclosure and internal controls representations, and Defendant Wolf and Guertin's certifications thereon, were materially false and misleading when made;

- that as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and earning guidance during the Class Period.

111. As a result of these materially false and misleading statements and material omissions of fact, Company Stock traded at artificially inflated prices. Plaintiff and other

29

members of the proposed Class that purchased or otherwise acquired Company Stock as a

retirement investment in the Plan have been damaged by these misrepresentations and omissions.

**B.    Defendants Knew or Should Have Known that Company Stock Was an Imprudent
Retirement Savings Option for Participants' Retirement Savings and Should Have
Taken Measures to Protect the Plan**

112.    Throughout the Class Period, Defendants knew or should have known -- had they

properly discharged their fiduciary obligations -- that Company Stock was an imprudent

retirement savings option for the Plan due to Defendants' material misrepresentations and

omissions about its business practices, financial results, guidance and outlooks which led to the

artificial inflation of the Company Stock share price. Defendants knew or should have known

that the Company's true financial condition would eventually come to light and the artificially

inflated share price would significantly decline. As a result, Company Stock was an unduly

risky and inappropriate investment option for the Plan participants' retirement savings.

113.    As a result of Defendants' knowledge of the public misstatements and omissions

concerning the Company's true financial health, any generalized warnings that Defendants made

to the Plan's participants regarding the Plan's investments in Company Stock did not effectively

inform the Plan's participants of the immediate and future risks of investing in Company Stock.

114.    Defendants also failed to take into account the changing risk profile of investment

in Company Stock as a result of the above-described circumstances and the Company's

deteriorating financial performance as demonstrated by objective indicators.

115.    Defendants failed to conduct an appropriate investigation into whether Company

Stock was a prudent investment for the Plan and failed to provide the Plan participants with

adequate and accurate information regarding Coventry's problems so that participants could

make informed decisions regarding their investments in the Plan.

116.    An adequate, or even cursory investigation, by Defendants would have revealed to a reasonable fiduciary that, under the circumstances, investment by the Plan in Company Stock was excessively and unduly risky, and thus, imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

117.    Because Defendants knew or should have known that Company Stock was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company Stock.

118.    Defendants had available to them several different options for satisfying this duty, including:

- making appropriate public disclosures, as necessary;

- divesting the Plan of its Company Stock;

- discontinuing further contributions to and/or investment in Company Stock under the Plan;

- consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or

- resigning as fiduciaries of the Plan to the extent that they could not loyally serve as Plan fiduciaries given their employment by Coventry.

119.    Despite the availability of these and other options, Defendants failed to take any action to protect the Plan and its participants from losses resulting from the Plan's imprudent investment in Company Stock.  In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as Coventry's problems came to light.

120.     In addition, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

**C.     Defendants Failed to Provide the Plan's Participants With Complete and Accurate Information About the True Risk of Investment in Company Stock in the Plan**

121.     ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants.

122.     At all relevant times, on information and belief, Defendants made direct and indirect communications with Plan participants regarding Company Stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases which, upon information and belief, were referenced in materials circulated by the Plan.

123.     Further, Defendants, as Plan fiduciaries knew or should have known certain basic facts about the behavior and characteristics of participants in 401(k) plans -- well known in the trade press and literature, namely that:

- employees tend to interpret a match in company stock as an endorsement of the company and its stock;

- out of loyalty, employees tend to invest in company stock;

- employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- employees tend not to change their investment option allocations in a plan;

- lower income employees tend to invest more heavily in company stock than more affluent workers, even though they are at greater risk; and

32

- even for risk-tolerant investors, the risks inherent in company stock are not commensurate with its rewards.

*See, e.g.,* Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior,* 116 Q.J. Econ. 4, 1149 (2001), http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149.

124.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the excessively high concentration of the Plan's funds in Company Stock, Defendants failed to take any meaningful ameliorative action to protect the Plan and thus the participants from their heavy investment in an imprudent retirement vehicle, Company Stock.

125.    In addition, despite Defendants' duty to provide critical information to participants regarding Plan investments, Defendants failed to provide the Plan's participants with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in Company Stock in the Plan.

**D.        Defendants Suffered From Conflicts of Interest**

126.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including investment in Company Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

127.    Conflicts of interest abound when a company that invests excessive amounts of plan assets in company stock, founders. This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one

33

hand, and to the plan and plan participants on the other. As courts have made clear, "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992). Fiduciaries must avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). Here, Defendants breached this fundamental fiduciary duty.

128.    Upon information and belief, Defendants failed to investigate whether to take appropriate action to protect the Plan and instead chose the interests of the Company over the Plan by continuing to offer Company Stock as an investment option for participant contributions in the Plan, make matching contributions in Company, and maintain Company Stock investments in the Plan.

129.    Certain Defendants who knew or should have know of Coventry's inflated stock price during much of the Class Period benefitted directly from this knowledge by selling their personal holdings of Company Stock for significant gain.

130.    These conflicts of interest put Defendants in the position of having to choose between their own interests as directors, executives and stockholders and the interests of the Plan's participants and beneficiaries, in whose interests Defendants were obligated to serve with "an eye single." Defendants did nothing to protect the Plan from the inevitable losses they would suffer. As a result, the Plan lost tens of millions of dollars because of its investment in Company Stock.

## VII.    The Relevant Law

131.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

132.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

133.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) authorizes individual participants to seek equitable relief from defendants, including without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

134.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B) provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

135.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Bierwirth*, 680 F.2d at 272 n.8.

136.    ERISA §405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

35

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan under the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)    if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## VIII.    Causes of Action

## COUNT I

### Failure to Prudently and Loyally Manage
### The Plan's Assets (Breaches of Fiduciary Duties in Violation of
### ERISA § 404 and § 405 by All Defendants)

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    At all relevant times alleged above, all Defendants were either named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets, or both. Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

139.    The scope of fiduciary duties and responsibilities of the Defendants included, on information and belief, managing the assets of the Plan for the sole and exclusive benefit of the

Plan's Participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Defendants were responsible for, among other things, reviewing and making policy recommendations with respect to the Plan, selecting prudent investment options, eliminating imprudent options, eliminating imprudent options, determining how to invest Company Matching Contributions to the Plan evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

140.    Yet, contrary to their duties and obligations under ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, these Defendants knew or should have known that Company Stock no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's undisclosed improper business practices, serious mismanagement, misstatements and omissions that caused the price of the Company Stock to be artificially inflated, and the collapse of the price of the stock would result in dire circumstances. Nonetheless, Defendants continued to offer Company Stock as an investment option for participant contributions, provided Company Matching Contributions in Company Stock, and maintained the Plan's enormous investment in the Company Stock.

141.    Defendants were obligated to prudently and loyally manage all of the Plan's assets. However, their duties of prudence and loyalty were especially significant with respect to Company Stock because: (a) company stock is a particularly risk and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, Defendants

were obligated to have in place a regular, systematic procedure for evaluating the prudence of investment in Company Stock.

142.    Moreover, Defendants failed to conduct an appropriate investigation of the merits of continued investment in Company Stock even in light of the losses, the Company's highly risky and inappropriate practices, and the particular danger that these practices posed to the Plan. Such an investigation would have revealed the imprudence of continuing to make and maintain investments in Company Stock.

143.    Under the circumstance, Defendants' decisions respecting the Plan's investment in Company Stock were an abuse of discretion. A prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's assets in Company Stock was appropriate.

144.    Defendants were obligated to discharge their duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 28 U.S.C. § 1104(a)(1)(B). Under the relevant law, a fiduciary is prudent if he gives appropriate consideration to those facts and circumstances that the fiduciary knows or should have known are relevant to the particular investment and he has acted accordingly.

145.    Defendants did not act prudently when they continued to invest Plan assets in Company Stock because they knew or should have known information about the Defendants' material misstatements and omissions concerning the Company's business practices, financial information and outlook which made Company Stock an extremely risky and imprudent investment for the Plan and improperly inflated the value of Company assets and share price.

38

Risk associated with investment in Company Stock at all relevant times was far above the normal, acceptable risk associated with investment in Company Stock.

146.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(I)(D), 29 U.S.C. §11 04(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

147.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and, indirectly, Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their assets and retirement investments.

148.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 11 09(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Adequately Monitor Fiduciaries
### (Against Defendant Coventry &  Defendants Wolf & Price )

149.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

150.    At all relevant times, as alleged above, Coventry and Defendants Wolf and Price were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

151.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Coventry and Defendants Wolf and Price included the responsibility to appoint, evaluate, and

39

monitor other fiduciaries, including the members of the Investment Committee and any other committees administrating the Plan.

152.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, Coventry and Defendants Wolf and Price had the duty to ensure the monitored fiduciaries:

- possessed the needed credentials and experience, or used qualified advisors and service providers to fulfill their duties;
- were knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's Participants;

- were provided with adequate financial resources to do their job;

- had adequate information to do their job of overseeing the Plan's investments;

- had ready access to outside, impartial advisors when needed;

- maintained adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

- reported regularly to the Company and/or the Director Defendants who were then required to review, understand, and approve the conduct of the hands-on fiduciaries.

153.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

154.    Coventry and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to

knowledge about the Company's business and finances as alleged above, which made Company Stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation. Coventry and Defendants Wolf and Price knew or should have known that the fiduciaries they were responsible for monitoring were imprudently continuing to invest the assets of the Plan in Company Stock when it no longer was prudent to do so. Despite this knowledge, Coventry and Defendants Wolf and Price failed to take action to protect the Plan or the Plan's Participants, from the consequences of these fiduciaries' failures.

155.   In addition, Coventry and Defendants Wolf and Price, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Coventry that they knew or should have known that the monitored fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

156.   Coventry and Defendants Wolf and Price are also liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

157.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries lost a significant portion of their retirement investments.

158.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Defendants)

159.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

160.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

161.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

162.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company's own securities and by otherwise placing their own and the Company's interests above the interests of the Participants with respect to the Plan's investment in the Company's securities.

163.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses. If Defendants had discharged their fiduciary duties to manage and invest the Plan's assets prudently, without conflicts of interest, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of

#1185415v.1

the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's

other participants and beneficiaries, lost a significant portion of their retirement investments.

164.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. §

11 09(a), Defendants in this Count are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Failure to Provide Complete and Accurate
### Information to the Plan's Participants
### (Against Defendants Coventry, Investment Committee, Guertin and Davis)

165.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

166.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan

within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were

bound by the duties of loyalty, exclusive purpose and prudence.

167.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

participants, not to mislead them regarding the plan or plan assets, and to disclose information

that participants need in order to exercise their rights and interests under the plan. This duty to

inform participants includes an obligation to provide plan participants with complete and

accurate information, and to refrain from providing inaccurate or misleading information, or

concealing material information, regarding a plan's investment options such that participants can

make informed decisions with regard to the prudence of whether or not to keep or divest their

plan investments. This duty applies to all of a plan's investment options, including investment in

Company stock.

#1185415v.1

168.    Defendants Coventry, the Investment Committee, Guertin and Davis knew or should have known that investment in Company Stock carried with it an undisclosed inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

169.    Defendants Coventry, the Investment Committee, Guertin and Davis breached their duty to inform Participants by failing to provide complete and accurate information regarding the Company's material public misrepresentations and omissions concerning the Company's business practices, financial strength and outlook and the consequential artificial inflation of Company Stock.   In general, Defendants breached their duties by conveying incomplete information regarding the soundness of Company Stock and the prudence of investing and holding retirement contributions in Company Stock.

170.    Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plan's investment in Company Stock.

171.    Defendants' omissions and incomplete statements were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plan's participants. In addition, they caused the Plan, and its participants and beneficiaries, to continue to make and maintain substantial investments in Company Stock at a time when the Defendants knew or should have known that the Plan's participants and beneficiaries did not have complete and accurate information concerning their investments. Participants relied to their detriment on Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company.

44

172.    Defendants are also liable as co-fiduciaries because (1) they knowingly participated in, and knowingly undertook, to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

173.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants constitute misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company and were material to any reasonable participant's decision about whether or not to maintain any part of their assets in Company Stock at all relevant times. Plaintiff and the other participants are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

## COUNT V

### Co-Fiduciary Liability
### (Against All Defendants)

174.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.    As alleged above, at all relevant times Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the

45

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

176.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.

177.   Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their co-fiduciaries' breaches of fiduciary duties and to provide other equitable relief as appropriate.

## X.     Causation

178.   The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company Stock at all relevant times, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan' participants.

179.   Defendants are liable for the Plan's losses in this case because the Plan's investment in Company Stock was the result of Defendants' decision to maintain the assets of the Plan in Company Stock and not inform Plan participants of the need to protect their financial interest such as by informing Plan participants of the risks of investment in Company Stock so that they could make informed decisions about their retirement funds.

180.   Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company Stock.

#1185415v.1

## XI.    Remedy for Breaches of Fiduciary Duty

181.    Defendants breached their fiduciary duties in that they knew or should have known the facts above and thus should have known the Plan's assets should not have been invested in Company Stock.

182.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

183.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good to such plan any losses to the plan ..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate ..."

184.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

185.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29

U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches

alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a);

(3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g),

the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these

amounts, as provided by law; and (6) such other legal or equitable relief as may be just and

proper.

     186.    Each Defendant is jointly liable for the acts of the other Defendants as a co-

fiduciary for losses suffered by the Plan in this case under ERISA.

### XII.    Class Action Allegations

     187.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Rules

23(a), (b)(1), and/or (b)(2) or (b)(3) of the Federal Rules of Civil Procedure on behalf of himself

and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of
> the Coventry Health, Inc. Retirement Savings Plan, at any time between February
> 1, 2007 and the present (the "Class Period") and whose Plan accounts included
> investments in Coventry Health common stock.

     188.    **Numerosity.**  The members of the Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are

several thousand members of the Class who participated in, or were beneficiaries of, the Plan at

all relevant times and whose Plan accounts included investment in Company Stock.  According

to a most recent Annual Report of the Plan on Form 11-K there were 21,932 Plan Participants at

the end of 2006.

#1185415v.1

189. **Commonality.** Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions affecting solely individual members of the proposed Class. Among the common questions of law and fact are:

- whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the proposed Class;

- whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the proposed Class by failing to act prudently and solely in the interests of the Plan and the Plan's Participants and beneficiaries;

- whether Defendants violated ERISA; and

- whether the Plan and members of the proposed Class have sustained damages and, if so, what is the proper measure of damages.

190. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(3), their claim is identical to a claim under that section brought by any other Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would apply to all Class members equally.

191. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the proposed Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Plan or the Class.

192. **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1 )(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

193.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### XIII.  Prayer for Relief

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(I)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

#1185415v.1

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company Stock;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order that Defendants allocate the Plan' recoveries to the accounts of all participants who had any portion of their account balances invested in the Company Stock of Coventry maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Coventry;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: <u>November 17, 2009</u>          **TYDINGS & ROSENBERG LLP**

By: _____
John B. Isbister, Fed. Bar No. 00639
Toyja E. Kelley, Fed. Bar No. 26949
100 East Pratt Street
Baltimore, MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
E-mail: jisbister@tydingslaw.com
E-mail: tkelley@tydingslaw.com

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Shanon J. Carson
Ellen T. Noteware
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:   (215) 875-4613

*Counsel for Plaintiff*

#1185415v.1